## WEIS v. WOODMAN.
### Patent Appeal No. 3162.

Court of Customs and Patent Appeals.
June 12, 1933.

C. A. Weed, of New York City, for appellant.

Redding, Greeley, O'Shea & Campbell, of New York City (Worthington Campbell, of New York City, of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal in an interference proceeding, wherein the Board of Appeals of the United States Patent Office awarded priority of invention upon all of the counts in issue, fourteen in number, to appellee, thus affirming the decision of the Examiner of Interferences as to counts 1 to 6, inclusive, and counts 12 and 13, and reversing his decision as to counts 7 to 11, inclusive, and count 14, the Examiner, as to the last named group of counts, having awarded priority of invention to appellant. Appellant here seeks review of the decision of the Board of Appeals upon all of said counts.

Of the two groups of counts, counts 1 and 9 are illustrative, and read as follows:

"1. A screen fabric formed of metal wire and having a mesh adapting it for use for screening purposes and provided along the parallel side edges thereof with sewing machine stitches forming friction-gripped, cushioned edges adapting the fabric to be effectively gripped and clamped along such edges."

"9. A screen fabric formed of metal wire and having a mesh adapting it for use for screening purposes and provided along the parallel side edges thereof with sewing machine stitches forming friction-gripped, cushioned edges adapting the fabric to be effectively gripped and clamped along such edges, said fabric having stitched markers at predetermined distances along a parallel edge."

The involved invention is sufficiently described in the counts quoted.

For convenience we shall refer to counts 1 to 6, inclusive, and counts 12 and 13, as the first group, and to counts 7 to 11, inclusive, and count 14, as the second group. The distinguishing feature of the two groups is the limitation, found in the second group, of markers at predetermined distances along the parallel edge of the wire fabric.

The interference arises between a patent, No. 1,710,669, issued to appellant, and an application of appellee, No. 230,234; claims from said patent were copied by appellee, said claims forming the counts here in issue.

Appellant's patent was issued on April 23, 1929, upon an application filed October 12, 1927; appellee's application was filed on November 1, 1927. Appellee is therefore the junior party to the interference, and appellant secured no advantage by the issue of the patent because appellee's application was pending at the time of such issue.

Appellant is vice president and general manager of the Metropolitan Sewing Machine Corporation, of Nyack, N. Y., hereinafter referred to as the Metropolitan Company. Appellee is the superintendent of Wickwire Spencer Steel Company, of Clinton, Mass., hereinafter referred to as the Wickwire Company. It appears that said corporations are the real parties in interest in this interference.

Voluminous testimony was taken by both sides, and there is sharp conflict between the parties as to the facts in the case.

It appears that the Wickwire Company, being a large manufacturer of wire screen fabric, desired to adopt a marking for such fabric to be used as a trade-mark; that, in pursuance of such object, appellee conceived the idea of providing, along the parallel edges of the screen fabric, sewing machine stitches, and had samples made of screen fabric so provided with stitches, made with a lock stitch sewing machine; that this occurred some weeks prior to the entry of appellant into the field. These facts are not disputed by appellant.

Both tribunals of the Patent Office held that appellee was in full possession of the invention involved in said first group of counts and disclosed it to appellant prior to appellant's entry into the field, and that therefore appellee was the original inventor of the process and article described in said counts.

It is the contention of appellant that appellee never conceived the idea of machine stitches forming friction-gripped edges, adapting the fabric to be effectively gripped and clamped along such edges, that this feature is the only element that makes said first group of counts patentable, and that he (appellant) is the original inventor thereof.

It is conceded by appellee that a double thread chain stitch does provide the cushioned edges called for by said counts, and that appellant was the first to provide samples of screen fabric so stitched. Appellant contends that a lock stitch cannot provide such cushioned edges, claiming that in such stitch the thread lies so close to the fabric that no cushioning effect can be produced.

Upon this point the Examiner of Interferences, speaking of "a friction-gripped, cushioned edge," said: "It is thought that such an edge is provided whether lock or chain stitching is used, since, with each type, there is thread projecting on each side of the cloth. Apparently chain stitching provides a better cushion, but there is nothing in the counts to exclude lock stitching. * * *"

The Board of Appeals did not expressly pass upon this point, holding it to be immaterial for the reason that it held that it was established that appellee contemplated the use of chain stitching before appellant entered the field, and so advised appellant.

Upon the point of whether a lock stitch will provide such cushioned edges, appellee introduced in evidence as Exhibit 5 a roll of screen fabric provided with a lock stitch of larger thread than used in producing the first samples. We think that the stitching upon such Exhibit 5 does meet all of the counts of the first group, except possibly counts 3, 4, and 12.

Appellant insists that it has not been established that said Exhibit 5 was made prior to the entry of Weis, the appellant, into the field; we are of the contrary opinion, and we think it is also established that appellee discovered, prior to the entry of appellant into the field, that such stitch also had a useful purpose, in that it prevented telescoping of the rolls when provided with such stitches.

We think that said Exhibit 5 embodies the essence of the invention embraced in the first group of counts, and that chain stitches, while desirable, are not necessarily employed in producing the article embodying the invention.

Appellant in his specification expressly states that various forms of stitches may be used, and that, by the use of larger thread or twine, different sized friction cushions may be built up.

The appellant, upon examination by his counsel, testified as follows: "Q248. Whether or not you can build up or put excessive thread into a lock stitch? A. To a very limited degree this might be accomplished, but by reason of the bobbin used in a lock stitch machine it is not practical for commercial operation."

It appears from the record that appellee's screen fabric samples, lock stitched as aforesaid, were submitted to the executives of the Wickwire Company at New York, and they determined to proceed with the manufacture of such screen fabric. Immediately following this decision, instructions were issued to "secure equipment for properly stitching this marker in our screen cloth production." This occurred on September 12, 1927, and the next day appellee called by telephone the Singer Sewing Machine Company, the Home Sewing Machine Company, and the Metropolitan Company, with a view to starting negotiations for the furnishing of sewing machines to do the stitching required upon the screen fabric. The representative of the Singer Company answered over the telephone that a representative of said company, a Mr. Coates, would visit their office that day. The representative of the Home Company informed appellee that they manufactured nothing but household machines, and referred appellee to the Metropolitan Company. For the latter company, Mr. A. H. Weis, a brother of appellant, responded, stating that the matter should be taken up with appellant, who was away from the city, but that appellant would call up appellee when he returned.

The said Coates testified on behalf of appellee, and stated that, after being informed by appellee that plain stitch machines were desired to carry on the aforesaid production, he (Coates) stated to appellee that for that purpose he should have a double-thread chain stitch machine, and explained to him the difference between a lock stitch and a chain stitch, upon appellee asking him to state what the difference was. Said Coates testi-

fied that Exhibit 5 was not shown to him, but that a smaller sample was shown in which the stitching was the same as that in Exhibit 5, except that it was a different colored thread. Appellee testified that he did show Coates said Exhibit 5, and that he told Coates that it was thought that a chain stitch machine was the most desirable. He further testified that he (appellee) had long been familiar with single thread chain stitch machines, but not with double thread chain stitch machines. Whether appellee suggested to Coates a chain stitch machine, or whether Coates suggested it to appellee, we do not deem material, for in either event appellee was aware, or became aware, at that time, that a chain stitch machine would better serve his invention than a lock stitch machine, and we therefore agree with both Patent Office tribunals that on September 13, 1927, before appellant entered the field, appellee was in possession of the idea of using the double thread chain stitch, the better to utilize his invention. It is established that said Coates had his interview with appellee about 1 o'clock on said September 13. Appellant testified that he called up appellee at 4 o'clock on said day; appellee insists that this was not done until the next day. We do not regard it as material which is correct, for either of the times named is subsequent to appellee's interview with the witness Coates.

The testimony is very unsatisfactory as to the exact conversation which took place between the parties hereto during said telephone conversation. Appellee's testimony as to the conversation over the telephone is very vague and lacks positiveness. He stated that he could not recollect the exact conversation, but that its substance was that he told appellant that he wanted to stitch a thread into the selvage of a screen cloth fabric for the purpose of a marker, and requested him to come to their plant to discuss the requirements that would be needed; that appellant agreed to come to the Wickwire plant on September 16, and appellee testified that, according to his best recollection, appellant agreed to bring some samples with him.

Appellant testified that appellee told him during said telephone conversation that "they wanted plain sewing machines that could be used for placing a line of stitches on the right and left edges of the wire screen cloth for the purpose of trade-mark."

Upon cross-examination, appellant testified that the Metropolitan Company does not manufacture lock stitch machines, whereupon he further testified as follows:

"XQ303. Did you tell that to Mr. Woodman on Sept. 13 when he specified a plain stitch machine? A. Certainly.

"XQ304. And did he thereupon tell you that he naturally would not be interested in the machines of your company, since he wanted a plain stitch machine? A. No.

"XQ305. What did he reply? A. I don't recall any reply.

"XQ306. Nevertheless he indicated that he would be glad to have you come up to Clinton to talk about the problem, is that correct? A. That was his request on Sept. 13 over the telephone."

The next day, the deposition of the appellant continuing, he testified that he did not state to appellee in the telephone conversation on September 13 that his company did not make plain stitch machines.

On the same day, September 13, appellant wrote to the branch office of the Metropolitan Company, stating in part as follows: "We have telephone inquiry from the Wickwire Spencer Steel Co. of Clinton, Mass., their Mr. F. N. Woodman called in reference to some right and left hand sewing machines for placing a line of stitching along the two outside edges of wire mesh screening. This material comes in widths from 18" to 48" and the mesh is 12, 14, and 16 to the inch. They would want the stitches spaced to suit the meshes. The proposition involves from 20 to 25 pairs of machines as I understand it. It seems that this stitching is put on to the edges of the wire for identification."

It will be observed that in this letter no mention is made of plain stitch machines.

Appellant's brother, A. H. Weis, testified that a chain stitch was the only type of machine made by the Metropolitan Company.

Appellant further testified that, the day after said telephone conversation, he went to a hardware store and purchased some wire screen cloth from which to make up samples to take to the Wickwire Company at Clinton; that his brother, A. H. Weis, did the stitching under his direction, appellant selecting the machine upon which the samples were to be made; that he selected various threads for experiment; and that they experimented with different sizes of thread and different degrees of tension on the needle; that by such experiments he discovered that, by the proper amount of tension upon the threads, suitable length of stitch, and proper adjustment of the thread controlling means, a stitch

was obtained that immediately stood out from the wire fabric as a cushion, and he thus discovered the utility of a wire fabric so stitched.

Appellant's brother testified as follows upon this point: " * * * After the phone talk was finished my brother asked me to make up some samples so that he could take them along to Clinton with him. The next day, which was Sept. 14th, 1927, he went to one of our local hardware stores and purchased some wire screen fabric, which he gave to me on which to make the samples. I made up a number of samples and submitted them to him. When these samples were handed to him in his office, we went over them together and he remarked that they looked very well and thought that he had struck a good idea, as the stitching made on our machines built up a heavy edge which he at the time termed as a sort of a cushion which would apply a friction and better grip the wire to the frame when tacked on. He also pointed out that the heavy stitching would be of advantage when placing the wire fabric onto the frame and it would afford a means of a better grip for stretching the wire. He also pointed out that the built up stitching would really make the edge of the wire stronger as it would be reinforced with the stitching. * * * "

He further testified that it was these samples, made by him, that appellant took to the Wickwire Company at Clinton on the next day, September 15, 1927.

We conclude from the foregoing that appellant did not make the experiments testified to, by him, as having been made before visiting the works of the Wickwire Company at Clinton, but that the samples were made by an ordinary double thread chain stitch machine, in the ordinary operation of such machine, by appellant's brother.

Appellant further testified as follows: "XQ443. Who first suggested to you the idea of stitching screen fabric along the parallel side edges with sewing machine stitches? A. That requirement was called for by the Wickwire Spencer Company, through their Mr. Woodman when he telephoned me on Sept. 13, 1927."

In view of the foregoing, we are unable to perceive that appellant had any other conception than that of a particular function accomplished by a structure made pursuant to the suggestion of appellee, which function may or may not have been known to appellee. We accept as a fact that appellant was the first to discover the utility of cushioned edges to insure effective gripping by the frame members of the screen.

Mere discovery of an additional function in a device invented by another does not constitute invention. In re Smith, 36 F.(2d) 302, 17 C. C. P. A. 644.

On September 15, 1927, appellant visited the plant of the Wickwire Company, taking with him samples of the screen fabric stitched on Metropolitan machines the preceding day, as aforesaid, and conferred at length with appellee and other representatives of the Wickwire Company. It is conceded by appellee that such samples were highly satisfactory, and appellant was assured that the necessary stitching machines would be secured from the Metropolitan Company. We think it is also established that the samples brought to the Wickwire plant by appellant also included linear markers, involved in the second group of counts.

Both tribunals of the Patent Office have concurred in finding that appellee was the original inventor of the subject-matter of said first group of counts, and, while the testimony upon both sides is unsatisfactory in some respects, it is our conclusion that no error was committed in such finding.

We think it proper to observe that in cases involving originality of invention the credibility of witnesses is usually involved, as it is here. It is unfortunate that in the trial of such cases by the Examiner the testimony must be taken by deposition, and he has no opportunity to observe the witnesses, while testifying, in aid of determining their credibility, such as has a court of equity in trying an infringement suit.

With respect to the second group of counts, the Examiner awarded priority of invention as to their subject-matter to appellant. The Board of Appeals reversed this finding and awarded priority of invention to appellee.

As hereinbefore noted, the feature distinguishing the second from the first group of counts is the element relating to marking upon the wire fabric at predetermined distances along a parallel edge. This feature was referred to in the record as "linear markers," and we shall use this term as embracing said element.

The Examiner of Interferences held that appellee had not established an independent conception of such linear markers, but that, if he did have such conception prior to the entry of appellant into the field, he was not diligent in reducing said element to prac-

tice; appellant having been the first to reduce it to practice.

The Board of Appeals, upon this point, expressly found that appellee had a complete conception of the feature of linear markers prior to the entry of appellant into the field, and that, while appellant was the first to reduce this feature to practice, appellee was diligent in reducing it to practice.

We are in agreement with the conclusion of the Board of Appeals that appellee had a full conception of the use of linear markers, as called for by the second group of counts, before appellant entered the field. Such conception is shown by the testimony to have been complete on August 30, 1927. It is our opinion that the testimony establishes that appellant independently conceived the use of linear markers, as called for by this group of counts, on September 14, 1927. Appellee was chargeable with diligence in reducing his conception to practice from immediately prior to appellant's conception, September 14, until the filing date of appellee's application, November 1, 1927, which was a constructive reduction to practice.

The Examiner of Interferences held that, assuming that appellee was the first to conceive that part of the subject-matter of the second group of counts relating to linear markers, the evidence establishes that he definitely laid it aside, and thus was lacking in diligence in reducing it to practice.

Upon this point the Board of Appeals held that the evidence shows that the subject of linear markers was laid aside by appellee only until a proper form of stitching could be secured; that the delay in filing appellee's application covering all of the counts here in issue, which application was prepared on October 29, 1927, was due to the conduct of appellant, who had promised to prepare the specification and drawings covering the subject-matter of all the counts here involved, to be used by appellee's attorney, who was the attorney for the Wickwire Company, in filing an application for a patent for the same, and for that reason the Board held that appellant was in no position to urge a lack of diligence upon the part of appellee.

We are in accord with this conclusion of the Board. The evidence establishes, and indeed appellant admits, that upon September 16, 1927, he, in company with one Granger, who had charge of patent matters for the Wickwire Company, went to said attorney for the Wickwire Company and discussed the invention with him with a view to such attorney preparing an application for patent; that appellant did promise to prepare specifications and drawings, as aforesaid, to be used by such attorney, but that directly thereafter appellant went to his own attorney, upon the same day, who advised him that it would be better to prosecute the application in the interests of the Metropolitan Company, appellant claiming to said attorney that he (appellant) had made the invention. Appellant did not make any one connected with the Wickwire Company acquainted with this fact, and he admits that until October 7, 1927, he had never made any claim to the Wickwire Company that he was the inventor. He does testify, however, that he thought they understood from the beginning that such was the fact.

Without reciting further details concerning this matter, we are of the opinion that, under the circumstances, there was no lack of diligence upon the part of appellee in reducing to practice the feature of linear markers, and any delay by appellee in applying for a patent covering said feature was due to the conduct of appellant.

In conclusion, with respect to all of the counts here involved, we think it proper to observe that the representatives of the Wickwire Company were led to believe by appellant's conduct from September 15, through a period of several weeks, that he (appellant) made no claim that he was the inventor of the subject-matter of the counts here involved, and appellant, who was experienced in patent matters, having taken out some 300 patents in this and foreign countries, must have known that the Wickwire Company was of the belief that the invention had been made by one of its employees; no other reason can be assigned for requesting appellant to take up the matter with the patent attorney of the Wickwire Company.

However, we consider this conduct of appellant only as a circumstance, proper to be considered with the other facts in the case, all of which lead us to the conclusion that the Board of Appeals did not err in awarding priority of invention, as to all of the counts here in issue, to appellee.

The decision of the Board of Appeals is affirmed.

Affirmed.